## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSE VASQUEZ, individually and on behalf of all others similarly situated, | **Case No.** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| HUEL INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Jose Vasquez ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this class action complaint against Defendant Huel Inc. ("Huel" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

### NATURE OF THE ACTION

1.     In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of the most basic expectation of privacy in one's online life. And when a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly transmits that data anyway, the misconduct is especially egregious.

2.     Huel operates a commercial website (the "Website"), through which users learn about Huel's protein powder products and daily green powder supplements, review nutritional information and health claims, purchase products, enroll in subscription plans, and explore promotional offers. Like many modern websites, the Website displays a cookie banner and a

cookie preferences interface (the "Cookie Preferences Interface") purporting to give users meaningful control over what data the Website collects or otherwise discloses to third parties (the "Tracking Entities") via software-based monitoring systems (the "Tracking Tools") embedded on the Website. Defendant's cookie banner assures users that they may control the sale or disclosure of their personal information, including by deactivating all non-essential cookies.



*Figure 1 – Cookie Banner of Huel, representing that users could change tracking behavior through cookie settings*

3.       Defendant's assurances are false. Cookie settings interfaces are deceptive and legally actionable where a website (1) begins placing and transmitting Tracking Tools before users have the ability to interact with the cookie banner, and (2) continues transmitting user data to Tracking Entities even after users toggle off the sale/sharing of personal information and reject all non-essential cookies. These practices plausibly constitute invasion of privacy, intrusion upon seclusion, and fraud, at a minimum.

4.       The Website begins placing and transmitting Tracking Tools, including cookies, the moment a user lands on any page, well before the user can view or act upon the cookie banner. The Website deploys and transmits data via the Tracking Tools to the Tracking Entities. Upon

information and belief, these Tracking Entities include TikTok, Snapchat, Reddit, and Meta (also referred to as "Facebook"), and additional advertising technology partners whose Tracking Tools, including cookies and "pixels," track users' browsing activities, Website interactions, inputs, device information, session data, and unique identifiers across the Website the moment users interact with the Website, load webpages, or otherwise trigger the events being monitored by the Tracking Tools. Even after users affirmatively toggle off the sale/sharing of personal information and reject all non-required cookies, the Website continues to deploy the Tracking Tools, allowing the Tracking Entities to access, duplicate, and send to themselves communications between users and the Website via the Tracking Tools.

5.      In short, the Website's cookie banner and Cookie Preferences Interface materially mislead users about the use and sale of users' data. Defendant lulls users into a false sense of privacy and control while simultaneously enabling third-party Tracking Entities to monitor users' online behavior in real time.

6.      Plaintiff visited the Website, most recently in 2026, to browse the Website. Plaintiff clicked "Cookie Settings," toggled off the sale/sharing of personal information, declined all non-necessary cookies, and selected "Confirm My Choices." In reliance on Defendant's representations, Plaintiff believed that the Website would modify its behavior in honor of Plaintiff's choices. Instead, Defendant continued to provide access to Plaintiff's browsing activity, page interactions, navigation patterns, and identifiers to the Tracking Entities for advertising and analytics purposes.

7.      Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiff's sensitive information, private communications, invade Plaintiff's fundamental right to privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so,

Defendant committed intrusion upon seclusion; violated the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; common-law fraud, deceit, and/or misrepresentation; unjust enrichment; violated New York's Deceptive Acts and Practices statute, N.Y. Gen. Bus. Law § 349; violated New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; and committed invasion of privacy in violation of N.Y. Civil Rights Law §§ 50 and 51. Plaintiff brings this action on behalf of himself and a class of similarly situated users harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A). Defendant has its principal place of business located in this District.

9.      This Court has personal jurisdiction over Defendant because Defendant is registered to do business and maintains its principal place of business in this District.

10.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

11.     Plaintiff Jose Vasquez is a resident and citizen of Texas. Plaintiff is and has been genuinely interested in the services and information offered through Defendant's Website and used the Website for its intended purpose. Plaintiff accessed the Website to browse Huel's

4

products, review product ingredients and nutritional information, and learn about available promotions and new product offerings. He did so more than once in 2025. He made at least one purchase via the Website in 2025. Plaintiff accessed the Website on the same devices and through the same web browser that he used to access social media platforms and third-party websites, including Meta (Facebook and Instagram), and other digital social and advertising platforms. Plaintiff was physically located in Texas at all relevant times while accessing and using the Website. Plaintiff visited the Website during 2025, causing his personal information, including browsing activity and device identifiers, to be intercepted and recorded by Tracking Tools and Tracking Entities the moment he communicated with the Website, despite the presence of a cookie banner that assured users that tracking would not continue. Plaintiff more recently visited the Website on January 15, 2026, in connection with the investigation of this case, and attempted to disable the Tracking Tools on the Website by using the cookie banner to decline all non-essential cookies. Despite Defendant's assertions to the contrary, choosing to decline all non-essential cookies did not disable all the Tracking Tools. Some of the Tracking Tools continued to monitor Plaintiff after he chose to reject non-essential cookies. As a result of Defendant's implementation of the Tracking Tools on the Website, and Defendant's fraudulent statements in the cookie banner, Plaintiff's sensitive information, including browsing activity, cookie identifiers, and device identifiers, was intercepted and recorded by Tracking Tools and Tracking Entities.

12.    Defendant Huel Inc. is in the business of developing, marketing, and selling nutritionally marketed food products, including protein powder products and daily green powder supplements, to consumers throughout the United States. Huel Inc. supports the marketing, sale, and distribution of its products to consumers nationwide, including through commercial websites

and digital platforms. Huel Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in the United States.

## FACTUAL ALLEGATIONS

### I.     How Websites Function

13.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

14.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[1]

15.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[2]

16.     When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[3]

17.     An IP address is "a unique address that identifies a device on the internet or a local network." Essentially, an IP address is:

---

[1] *What is the difference between webpage, website, web server, and search engine?*, Mozilla, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan 07, 2026).
[2] *Id.*
[3] *How the web works*, Mozilla, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan 07, 2026).

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[4]

18.     When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[5]

19.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

20.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[6] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[7]*

21.     Website owners or web developers write and manage the URLs for their websites.

---

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan 07, 2026).
[5] *Id.*
[6] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[7] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan 07, 2026).

22.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[8] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

23.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[9] Today, UTF-8 is the Internet's most common character encoding.[10]

24.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[11] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[12]*

---

[8] *Id.*

[9] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan 07, 206).

[10] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan 07, 2025).

[11] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan 07, 2025).

[12] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 22, 2025).



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*



*Figure 6 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

25.    After the user sends the Request URL, the server sends the HTTP Response to the user, and the user's browser assembles the HTTP Response packets into the source code of the webpage. The webpage code is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML, CSS, and JavaScript code.[13]  This is the visible, and usually interactable, website that most people think of.

26.    To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages such as JavaScript snippets, which are embedded or called within the HTML code.[14]

27.    Such complex tasks include scheduling appointments or monitoring and reporting user activity.

28.    In short, the Internet relies on a constant back-and-forth stream of requests being sent between the user and servers.

---

[13] *How the web works?*, MOZILLA, How_the_web_works (last visited Jan 09, 2025).
[14]    *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan 07, 2026).

29.     Unbeknownst to users, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up users' communications with the Website.

## II.    Defendant Programmed the Website to Include the Tracking Tools

30.     Defendant voluntarily integrated Tracking Tools from various Tracking Entities into the Website's programming. Defendant's use of Tracking Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

31.     The Website, by using the Tracking Tools, causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by the Tracking Entities' and Website's servers to a user's web browser and stored locally on the user's device. Targeting, analytics, and advertising cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically harvested by the Tracking Tools and transmitted back to web servers through HTTP requests when users trigger the Tracking Tools, allowing the Website and Tracking Entities to identify the device and user communicating with the Website and to record how the user interacts with the Website.

32.     First-party cookies are those placed directly on the user's device by the Website, which the user is knowingly communicating with. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

33.     Third-party cookies are placed by third-party servers, not the Website, such as reddit.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded Tracking Tools, the Tracking Entities' scripts determine whether their cookies already exist on the user's device and, if not, cause those cookies to be created and stored. These third-party cookies contain unique identifiers that allow Tracking

Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

34.    As detailed further below, third-party cookies that are placed on users' devices during interactions with the Website are used to intercept and record users' communications for the Tracking Entities, including, but not limited to, information reflecting users' browsing and visit activity, such as webpages viewed, URLs, titles, keywords, time spent on pages, navigation paths, and the frequency and recency of visits to the Website, as well as session-level details including timestamps, duration, and actions taken during Website visits, and referring URLs identifying the website or platform directing the user to the Website.

35.    This tracking further captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, location data, and inferred interests, preferences, age, location, or characteristics derived from user behavior and content engagement. In addition, the information collected includes device and technical identifiers such as device type, operating system, browser type, and related identifiers; persistent user identifiers enabling recognition of users across sessions and websites, and approximate geolocation data derived from IP addresses or other signals. Collectively, this information is referred to herein as "Sensitive Information."

36.    Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, cookies enable Defendant and the Tracking Entities to enhance revenue and marketing effectiveness through the collection, analysis, and dissemination of user data.

37.     Defendant owns and operates the Huel Website, which allows users to learn about Huel's food and nutrition products, explore product categories and subscriptions, review pricing and promotions, create and manage user accounts, and purchase products directly. When users interact with the Website—by browsing pages, viewing specific products, clicking links, creating accounts, entering personal information, or completing purchases—they transmit Sensitive Information directly to Defendant.

38.     Defendant chose to integrate the Tracking Tools into the Website. As a result, when users visit the Website, both first-party and third-party cookies are placed on users' devices and/or transmitted to Tracking Entities' servers. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded, Defendant has complete control over whether these cookies are placed and whether user data is transmitted to third parties.

39.     Defendant explains its use of third-party cookies on the Website's cookie consent and preference interface by stating, in substance, that it may use cookies for analytics, personalization, and targeted advertising.

40.     The Cookie Preferences Interface further represents that disabling "cookies" may impact user experience.

> "You can manage which cookies are set on your device by clicking on the different category headings below. Please remember that disabling some categories of cookies may impact your experience of our sites as some features may not work properly."[15]

41.     Defendant provides additional disclosures regarding its use of third-party cookies in its Privacy Policy. In the section addressing "Disclosures of your personal data," Defendant

---

[15] Huel's cookie consent preference (under consent preferences) window as it was available when Plaintiff opted out of cookies and tracking technologies on the Website.

informs users that third parties providing advertising services may collect or receive information about users' interactions with the Website.

> "We also share data with third parties connected to advertising, retargeting and analytics. Please see Cookies above, including the cookie list, for more information about how cookies are used in relation to third parties.
>
> We may also share data with third parties to whom we may choose to sell, transfer, or merge parts of our business or our assets. Alternatively, we may seek to acquire other businesses or merge with them. If a change happens to our business, then the new owners may use your personal data in the same way as set out in this privacy policy."[16]

42.    In the section addressing 'Cookies', Defendant further explains that Tracking Entities use cookies, which are likely analytical/performance-based cookies.

> Please note that third parties (including, for example, advertising networks and providers of external services like web traffic analysis services) may also use cookies, over which we have no control. These cookies are likely to be analytical/performance cookies or targeting cookies.[17]

### III.    Defendant Falsely Informed Users That They Could Opt Out of the Website's Use of Cookies

43.    When users visited the Website, the Website immediately displayed a pop-up cookie consent banner and a related Cookie Preferences Interface. The banner and cookie settings informed users that cookies are used on the Website and represented that users may manage which cookies are set on their device by clicking on different cookie category headings. The interface further advised users that disabling certain categories of cookies may impact their experience on the Website, including that some features may not function properly, while presenting users with the option to manage their "Cookie Settings."

---

[16] Huel, *Privacy Policy*, https://huel.com/pages/privacy-policy (last visited Jan 07, 2026).
[17] *Id.*



*Figure 7 – Cookie Banner of Huel representing a "Cookie Preferences Interface" to accept or manage cookie settings*

44.     Website users who selected the "Manage Consent Preferences" option were presented with a cookie settings pop-up, which represented that users could control how their Sensitive Information was collected, used, sold, or shared by adjusting toggles related to targeted advertising, selling, or sharing of personal information, consistent with applicable law.

45.     After clicking to expand the cookie settings section, Defendant represented to users, in substance, that they could disable the cookies by using the toggle switch, and that if users opted out, it would impact the experience and some features may not work.





*Figure 8 – Cookie Settings representing users with an option of disabling the selling of user information and targeted advertising*

46.    After users moved the toggle to indicate their choice to disable the sale or sharing of their personal information and to decline all non-essential cookies other than those strictly necessary and clicked "Confirm My Choices," users were permitted to continue browsing the Website. At that point, the cookie banner and the cookie settings window disappeared.

47.     Defendant's cookie banner and cookie settings led Plaintiff, and all Website users similarly situated, to believe that they had successfully disabled the sale or sharing of their information and all non-essential cookies. The banner and preference window further reasonably led users to believe that Defendant would not allow third parties, through cookies or similar technologies, to access users' Sensitive Information with the Website, including their browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—after users exercised their control over disabling the Tracking Tools.

48.     These representations were false. In reality, Defendant did not abide by users' expressed preferences. When users moved the toggles to opt out of the sale or sharing of their personal information and to reject all non-essential cookies, they clearly communicated that they did not consent to the placement or transmission of the Tracking Tools, including non-essential cookies. Nevertheless, Defendant continued to cause the Tracking Tools to be placed on users' browsers and devices and/or transmitted to Tracking Entities, together with user data.

49.     Specifically, even after users opted out of the sale or sharing of their personal information and declined all non-essential cookies, Defendant continued to cause cookies to be placed on users' devices and/or transmitted to Tracking Entities, resulting in the real-time collection of user data that disclosed Website users' Sensitive Information. This included, without limitation, browsing history, visit history, Website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even after users

attempted to protect their privacy by rejecting cookies, Defendant continued to transmit user data to Tracking Entities.

50.    Certain aspects of the operation of cookies and Tracking Tools on the Website can be observed using website developer tools that log network traffic transmitted to and from a user's device while interacting with the Website.

51.    Network traffic logs generated through such tools reveal HTTP requests and transmissions between users' browsers and multiple Tracking Entities while users visit and interact with the Website.



*Figure 9 - Screenshot depicting Developer Tool on user's browser showing network activity for Reddit third-party cookies*



*Figure 10 - Screenshot depicting Developer Tool on user's browser showing Reddit third-party cookies*

52.     These network logs demonstrate that, even after users rejected non-essential cookies and opted out of the sale or sharing of their personal information, users' browsers continued to make numerous requests to third-party domains, such as Snapchat and Reddit, and otherwise used non-essential cookies to track users.

53.     Through these ongoing transmissions, Website users' Sensitive Information, including browsing history, visit history, interactions, inputs, session data, identifiers, and device-level information were surreptitiously disclosed to Tracking Entities. These Tracking Tools enable Tracking Entities to track users across websites and over time correlate user behavior with other datasets, and compile detailed user profiles reflecting users' preferences, behaviors, demographics, and inferred characteristics. These profiles are monetized for advertising, analytics, and marketing purposes.

54.     The Tracking Tools that Defendant caused to be loaded and executed by users' browsers function as unlawful wiretaps when they are executed because they enable Tracking Entities that are separate and distinct from the parties to the communications to eavesdrop on, record, extract, analyze, and exploit users' Sensitive Information. These Tracking Entities are not

mere passive tools or instruments of Defendant; it independently collects and uses the intercepted communications for its own commercial purposes.

**IV.    Defendant's Website Uses Tracking Tools to Spy on Users.**

55.    Defendant operates the Website and has installed on the Website software created by Tracking Entities. These Tracking Tools operate invisibly, tracking Defendant's site visitors' activity surreptitiously.

56.    The Tracking Tools collect information about users' site activity when events specified by Defendant, like viewing a specific webpage, are triggered. Defendant determines just how much data is collected by the Tracking Entities and how specific that data is, which can be seen in the parameters included in the detailed URLs and the metadata found in the payload of HTTP Requests.

57.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[18] URL parameters include key-value pairs formatted as "key=value":

    a.    The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

    b.    The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)

---

[18] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Jan 07, 2026).

*Figure 11 - Diagram of a URL displaying how parameters function*[19]

### A.    The TikTok Pixel

58.    TikTok offers software – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

59.    The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website, before any pop-up or cookie banner advises them of the invasion or seeks their consent. To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[20]

60.    Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 14* and *16*—the TikTok JavaScript code in *Figure 14* references

---

[19] *Id.*

[20] *See generally Troubleshoot with Pixel Helper*, TikTok, *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Jan 07, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

Defendant's Pixel ID, whereas the "code" variable in *Figure 16* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C33GTI7G09F7S5THL690".

61.    TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[21]

62.    These events, when triggered, cause the relevant data to be sent to TikTok via the TikTok Pixel as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

63.    The TikTok Pixel also collects:

    a.    The time website actions took place;

    b.    The IP address (which is used to determine the geographic location of a user);

64.    Device information, including make, model, operating system, and browser information;

    c.    Cookies that can be used to identify users; and

    d.    Metadata and button clicks.[22]

65.    The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

---

[21] *How to Set Up Events and Parameters with Events Builder*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Jan 07, 2026) (describing how to designate events).
[22] *About TikTok Pixel*, TikTok, https://ads.tiktok.com/help/article/tiktok-pixel (Jan 07, 2026).

66.     TikTok's "Advanced Matching" feature allows TikTok to "match customer information such as email and phone number along with actions people take on [the Website]."[23] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[24] TikTok then provides Defendant with detailed marketing profiles of its users, including custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[25] Lookalike audiences provided by TikTok allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[26]

67.     Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[27]

68.     Defendant used the TikTok Pixel to allow TikTok to monitor and log, in real time, when users clicked on specific links, loaded webpages, and viewed certain content.

69.     The TikTok Pixel also captures users' identifying cookies (for example, _ttp cookie is used to identify TikTok users[28]).

---

[23] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Jan 07, 2026).
[24] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Jan 07, 2026).
[25] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Jan 07, 2026) (benefits of using the TikTok Pixel).
[26] *See How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Jan. 07, 2026).
[27] *Id.*
[28]                      *See*                      https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Jan. 07, 2026).

70.     Plaintiff had a reasonable expectation that: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in Defendant's services, and (iii) Plaintiff's IP address and who Plaintiff was communicating with to obtain the products would not be exposed to the Tracking Tools placed by Defendant.

71.     Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[29]

72.     TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[30]

73.     According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[31]  The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[32]

74.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[29] *See Benefits of using the TikTok Pixel*, TIKTOK, (Sept. 6, 2025) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Jan. 07, 2026).

[30]     *TikTok    Business    Products    (Data)    Terms*,    TIKTOK    (July    29,    2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Jan. 07, 2026).

[31]     *See Aaron Katersky*, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited. Jan 07, 2026).

[32] *Id.*



*Figure 12 – Home page of Website*



*Figure 13 – Using a browser's "developer tools" on a Huel webpage shows the Website loading TikTok Pixel's code onto the user's browser*



*Figure 14 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

75.    The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the screenshots below, the sample webpage being viewed is depicted, along with the webpage code showing the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to its collection of user behavior:



*Figure 15 – Sample product on the Website*



*Figure 16 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 15*

76.     To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

77.     The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[33]

78.     The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[34]

79.     TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[35] TikTok makes clear that the onus is on the Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

80.     TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[36]

81.     As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and

---

[33] *TikTok     Business     Products     (Data)     Terms*, TikTok     (July     29,     2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Jan 07, 2026).
[34] *Id.*
[35] *Id.*
[36] *Id.*

warn its users that the Website would disclose their information in a manner that threatened their private information.

**B.      The Facebook Pixel**

82.      Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on its websites, which can then be shared with Facebook.

83.      The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Pixel.[37]

84.      Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[38] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[39]

85.      This Pixel ID must match "a known Pixel ID" in Meta's system,[40] and is transmitted by the Meta Pixel.[41]

86.      As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[42]

---

[37]      *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 22, 2025).
[38]      *Id.*
[39]      *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[40]      *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Jan. 07, 2026)
[41]      *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 07, 2026).
[42]      *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Jan. 07, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").

87.     Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[43] Receiving this information enables Facebook and Defendant to build valuable personal profiles for Website users to inform its targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[44]

88.     The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[45]

89.     Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

90.     When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[46] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

91.     The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.



*Figure 17– Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

---

[43] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Jan. 07, 2026).
[44] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan. 07, 2026).
[45] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Jan. 07, 2026).
[46] *Cookies Policy: What are cookies, and what does this* policy cover?, *Facebook* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Jan 07, 2026).

92.    The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 17*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 18 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

93.    The Pixel tracks user activity on web pages by monitoring events,[47] which, when triggered, cause the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[48] Examples of events utilized by websites include: (i) a user loading a page with a

---

[47]                *About                Meta                Pixel*,                FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Jan. 07, 2026).
[48] *See generally id.*

Pixel installed (the "PageView event");[49] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[50] (iii) when a user adds a product to their shopping cart (the "AddToCart" event, collectively with PageView event, and ViewContent event, the "Pixel Events").[51] The Website utilizes these Pixel Events.[52]

94.      Defendant's use of the Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel IDs of "24902154742789135" and "1573652859380772".

95.      Defendant uses the Facebook Pixel to monetize its Website users' Sensitive Information.

96.      Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

97.      Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 15.*

---

[49] *Specifications      for      Meta      Pixel      standard      events*,      FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Jan. 07, 2026).
[50] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Jan. 07, 2026).
[51] *Id.*
[52] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About      the      Meta      Pixel      Helper*,      FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Jan. 07, 2026).



*Figure 19 – Facebook Pixel tracking a user landing on the webpage from Figure 15 through the "ViewContent" event*



*Figure 20– Facebook Pixel tracking a user landing on the webpage from Figure 15  through the "PageView" event*



*Figure 21– Facebook Pixel tracking a user landing on the webpage from Figure 15  through the "AddToCart" event*



*Figure 22– Facebook Pixel tracking a user landing on the webpage from Figure 15 through the "Costco" event*

98.     When a business applies with Facebook to use the Facebook Pixel, it is provided with details about its functionality, including with respect to private information.[53]

99.     To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

100.     The Facebook Terms inform website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[54]

101.     The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[55]

102.     Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[56] *before* data can be shared.[57]

103.     Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

---

[53] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 07, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").
[54] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403Ds PEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan. 07, 2026).
[55] *Id.*
[56] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*
[57] *Id.*

104.    Facebook educates or reminds Facebook Pixel users of its responsibility to inform its users of its website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[58]

105.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### C.    The Reddit Tag

106.    Additionally, Defendant has installed a tracking pixel on its Website created by social media platform, Reddit (the "Reddit Pixel").

107.    The Reddit Pixel is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions the visitors take.[59] The harvested data is subsequently used by the website owner to serve targeted ads to website visitors on Reddit.

108.    The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that visitors take on the websites ("events"), such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[60]

---

[58] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Jan. 07, 2026).
[59] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Dec. 22, 2025); *Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan. 07, 2026).
[60] *Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Jan. 07, 2026).

109.     Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser[61] and to specify "which business account should receive" the user's tracking data.[62]

110.     In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_ggk9trqk3ue3". This data is sent both when receiving communications from the Website and as users send communications to the Website.

111.     Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

112.     Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a visitor and sends that email information to Reddit.[63]

113.     In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional personal information to Reddit, known as "match keys," to identify website visitors.[64]

114.     IP addresses are match keys website owners are *required* to send to Reddit, while other match keys may be used, including:

- Email addresses;

- Phone numbers;

---

[61] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Jan. 07, 2026).
[62] *About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Jan. 07, 2026).
[63] *Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Jan 07, 2026).
[64] *About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Jan 07, 2026).

- Mobile Advertising IDs (a unique identifier for a mobile user);

- Reddit Click IDs (to attribute click conversions more accurately);

- External IDs (an advertiser-assigned identifier that enhances match accuracy);

- Reddit UUIDs (a unique ID generated by the Reddit Pixel);

- User Agents (which identify the software the user is using to access the website); and

- The visitor's screen dimensions.[65]

115.    This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

116.    Defendant's website code implicates the use of the advanced auto-match feature, as depicted below:

```
...
16: [function(t, n, r) {
      "use strict";
      var i = t("./constants")
        , o = t("./helper")
        , u = t("./pageEventsListeners")
        , a = t("./automaticAdvancedMatching/index");
      n.exports = {
          getPixelConfig: function(t) {
              var n = "".concat(i.EVENT_CONFIG.EVENT_CONFIGS_URL, "/").concat(t, "/config")
                , r = new XMLHttpRequest;
              r.open("GET", n);
              var e = function() {
```

*Figure 23 - Advanced Auto Matching present in Defendant's Reddit Pixel code*

117.    Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of ad campaigns, improve its ability to attribute activity to specific ad campaigns, track visitors across devices, and help them create more precisely targeted ad campaigns.[66]

---

[65] *Id*

[66] *Id.*

118.    Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[67]

119.    Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user viewing the Website.



*Figure 24 – Reddit Pixel tracking a user visiting the webpage from Figure 15*

120.    To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

121.    The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit, of users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[68]

122.    The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

123.    The Reddit Terms explicitly condition the use of the Reddit Pixel on website owners' warranties that they: (i) provide "prominent and legally-sufficient notice" of the Reddit

---

[67] *Reddit Privacy Policy*, REDDIT (Aug. 16, 2024), https://www.reddit.com/policies/privacy-policy#policy-h2-4 (last visited Jan 07, 2026).

[68] *Reddit Business Tool Terms*, REDDIT (Jan. 1, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Jan 07, 2026).

Pixel's data sharing to users; (ii) provide "clear, prominent and legally sufficient instructions regarding how to opt out of data collection and use of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent[.]"[69]

124.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### D.    The Snap Pixel

125.    Defendant also installed code on the Website created by Snapchat that tracks Website visitors' actions, behavior, and conversions across the Website (the "Snap Pixel").

126.    To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, receive a Pixel ID, select the information to be collected, follow specific guides for integration with third-party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[70]

127.    The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[71]

---

[69] *Id.*

[70] *Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US&r=692&ui-knowledge-components-aura-actions.KnowledgeArticleVersionCreateDraftFromOnlineAction.createDraftFromOnlineArticle=1 (last visited Dec. 22, 2025).

[71] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-pixels/640739d87517d84a3aaf2d26 (last visited

128.    "For the Pixel to work, [Snapchat] must receive a Pixel ID and a standard event type[,]" at a minimum.[72]

129.    The Pixel ID is an "[a]dvertiser specific ID . . ."[73] where the Pixel ID is used to initialize the Snap Pixel's tracking,[74] identifying which advertising account receives the collected data.

130.    This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[75]

131.    Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[76] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type information.[77] The information is collected immediately as users land on the website where the pixel is installed. [78]

---

October 09, 2025); Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

[72] Snap Pixel FAQ, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Dec. 22, 2025).

[73] *Snap Pixel Helper Glossary*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Dec. 22, 2025).

[74] *See About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Dec. 22, 2025).

[75] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025).

[76] *Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Dec. 22, 2025).

[77] *Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Dec. 22, 2025).

[78] *Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025); *see also* Marialuisa Aldeghi, *How to set up the Snap Pixel: A step-by-step guide*, LEADSBRIDGE (Dec. 18, 2024), https://leadsbridge.com/blog/snap-pixel/ (last visited Dec. 22, 2025).

132.    The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[79]

133.    The Snap Pixel collects:

- The time the website actions occurred;[80]

- Device information such as the hardware model, operating system, and browser type used;[81]

- Cookies;[82]

- Metadata such as button clicks, time spent on the site, conversations, and page visits;[83] and

- IP addresses for general geographic data.[84]

134.    The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to its site. This data helps Defendant refine its advertising strategies by identifying high-performing campaigns and optimizing ad spending.[85]

135.    The Website's Snap initialization code and Pixel event activations transmit Defendant's Pixel ID in the form of a URL parameter named "pid", which contains Defendant's Snap Pixel ID value of "4043a900-607e-45d5-a47c-47e6254223f0". This data is sent both when

---

[79]    *About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US#:~:text=The%20Snap%20Pixel%20is%20a,to%20manage%20your%20privacy%20settings (last visited Dec. 22, 2025).

[80]    *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Dec. 22, 2025).

[81]    *Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).

[82]    *Cookie information*, SNAP (Apr. 8, 2025), https://www.snap.com/privacy/cookie-information (last visited Dec. 22, 2025).

[83]    Ate Keurentjes, *How do you install the Snap Pixel via Google Tag Manager*, TAGGRS (Oct. 23, 2025), https://taggrs.io/en/snap-pixel/ (last visited Dec. 22, 2025).

[84]    *Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Dec. 22, 2025); *see also Privacy Policy*, SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025); *Data Processing* Agreement, SNAP (July 25, 2025), https://www.snap.com/terms/data-processing-agreement (last visited Dec. 22, 2025).

[85]    Aldeghi, *supra* note 2.

receiving communications from the Website and when users send communications to the Website.

136.    The information the Snap Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

137.    Snap also independently benefits from non-customer list audience information.[86]

138.    The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[87] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[88]

139.    Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

140.    Snap Pixel requires advertisers, such as Defendant, to integrate code into its website's header or use tools like Google Tag Manager for a seamless setup.[89] Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking, and track user activity.[90]

141.    Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.[91] The data received

---

[86] *See Privacy Policy, Section 2(g),* SNAP (Apr. 21, 2025), https://values.snap.com/privacy/privacy-policy (last visited Dec. 22, 2025).
[87] Aldeghi, *supra* note 2.
[88] *Id.*
[89] *Id.*
[90] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Dec. 22, 2025).
[91] *Id.*

from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[92]

142.    Using Snap Pixel helps Defendant collect important information about the people who buy from it, so that Defendant, in turn, can benefit. Here are some of the biggest benefits:

- **Measure conversion events that matter**: See all the actions users take on the Website, across all devices, and attribute conversions back to ad campaigns.

- **Reach the perfect audience**: Defendant can create custom audiences and lookalike audiences based on the specific actions users have taken on the Website.

- **Optimize advertising campaigns**: Use real-time insights to optimize delivery of Defendant's campaigns for more effective results.[93]

143.    An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:



*Figure 25 - Snap Pixel active on the Website*

---

[92] *Id.*

[93] *Benefits of Using the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Dec. 22, 2025).

144.    When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a page.

145.    The Snap Pixel's functionality is not disclosed on the Website.

146.    By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

147.    By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[94]

148.    The Snap Terms further require Snap Pixel users, such as Defendant, of its responsibility to secure and maintain "all necessary rights, licenses and consents required to provide or make available the personal data" shared through the Snap Pixel.[95]

149.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their information in a manner that threatens their private information.

---

[94]    *Personal    Data    Terms*,    SNAP    (Dec.    9,    2024),    https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary (last visited Dec. 22, 2025).
[95]    *Id.*

V.    **Defendant Procured Tracking Entities to Intercept the Contents of Communications in Transit**

150.    Under federal wiretap law, the "contents" of a communication refer to the intended message conveyed by the communication, not merely record or routing information generated incidentally.

151.    Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

152.    Here, the network requests intercepted by the Tracking Entities included Request URLs containing the names of the webpages that users viewed on the Website.

153.    The Tracking Tools intercepted the contents of Plaintiff's communications contemporaneously with Plaintiff's interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tools loaded onto Plaintiff's browser and continued to transmit data at the moment Plaintiff submitted information through the Website.

154.    This interception, duplication, and transmission occurred inside Plaintiff's browser, before the communications reached their intended destination, and therefore occurred while the communications were in transit.

155.    The Tracking Entities were third parties to Plaintiff's communications with the Defendant and read the data in transit.

156.    Defendant's deployment of the Tracking Tools enabled those Tracking Entities to intercept Request URLs that specified the content Plaintiff accessed on the Website.

A.    **Defendant Aided and Abetted Third-Party Interceptions**

157.    A party violates Federal Wiretap not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception. "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant

who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.,* 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021).

158.    Defendant knowingly embedded and configured the Tracking Tools in a manner that enabled the Tracking Entities to intercept the contents of Plaintiff's communications with the Website.

159.    Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept those communications.

**B.    Defendant Lacked Consent and Misrepresented the Effectiveness of Cookie Controls**

160.    Plaintiff's investigation revealed that the Website's default settings permitted tracking to begin immediately, before users had any opportunity to review or act upon the cookie banner.

161.    As a result, users were tracked as soon as they landed on the Website home page, without prior consent.

162.    Plaintiff visited the Website while those default tracking settings were active.

163.    Users who visit the Website are shown a cookie banner offering the option to accept only 'necessary' cookies.



*Figure 26 – The Cookie Banner shown to users who visit the Website*

164.    Despite those representations, even users who declined all unnecessary cookies continued to be tracked by TikTok, Facebook, Reddit, and Snapchat cookies.

165.    Representations regarding cookie-consent controls are materially misleading where tracking continues despite users' opt-out selections.

166.    Defendant and the Tracking Entities benefited from the interception of Plaintiff's communications by reading and subsequently using the intercepted contents to construct detailed profiles reflecting Plaintiff's browsing habits and interests, and by using those profiles for targeted advertising.[96]

---

[96] *See About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Jan 07, 2026). ; *Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Jan 07, 2026); *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Jan 07, 2026).

167.    The Tracking Entities independently benefit from the interception of communications by using data collected through the Tracking Tools to improve their own advertising products and to market those capabilities to other businesses.[97]

## CLASS ALLEGATIONS

168.    Plaintiff brings these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class (collectively "the Class"):

> All users who visited and interacted with the Defendant's website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Nationwide Class").

169.    Specifically excluded from the Class is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

170.    Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

171.    NUMEROSITY: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members

---

[97] *See TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms(last visited Jan 07, 2026).; *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403Ds PEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Jan 07, 2026).

is impractical. The exact identities of Class Members may be ascertained by the records maintained by the Defendant.

172.    <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

      a.    Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

      b.    Whether Defendant obtained effective and informed consent to do so;

      c.    Whether Class Members are entitled to statutory penalties; and

      d.    Whether Class Members are entitled to injunctive relief.

173.    <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by the Defendant, Plaintiff is asserting claims that are typical of the Class.

174.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

175.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, the Defendant will likely

continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On behalf of Plaintiff and All Class Members)

176.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

177.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

178.    The tort of intrusion upon seclusion requires (a) an intentional intrusion into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy, and (b) that the intrusion be highly offensive to a reasonable person.

179.    By causing the Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, Defendant intentionally intruded upon the solitude and seclusion of Plaintiff and Class members.

180.    Plaintiff and Class members had an objectively reasonable expectation of privacy in their Sensitive Information with the Website because Defendant represented that users could opt out of the sale/sharing of their personal information and opt out of non-essential cookies and Tracking Tools.

181.    Defendant's intrusion, placing Tracking Tools and enabling Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, was highly offensive to a reasonable person.

182.    As a direct and proximate result of Defendant's intentional intrusion, Plaintiff and Class members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE FEDERAL WIRETAP ACT
## 18 U.S.C. § 2510, ET SEQ.
### (On behalf of Plaintiff and All Class Members)

183.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

184.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

185.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

186.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

187.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

188.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

189.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

190.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

191.    Defendant is a "person" within the meaning of the Wiretap Act.

192.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

193.    Plaintiff had a reasonable expectation of privacy in his electronic communications with the Defendant's Website, including his searches, browsing activity, and order-related interactions, particularly where the Defendant represented through its cookie banner, Cookie Preferences Interface, and Privacy Policy that users could opt out of the sale/sharing of personal information and decline non-essential Tracking Tools.

194.    The reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intents, and behavior on a commercial website, such as searches, menu selections, and order interactions, are sensitive and convey the substance and meaning of the communication.

195.    A reasonable user is entitled to assume that any disclosure of the contents of his communications occurs lawfully and with consent. To hold otherwise would require users to assume that their privacy will be violated illegally as a matter of course.

196.    Plaintiff reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of his electronic communications with Defendant's Website.

197.    Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiff's consent, for the unlawful purpose of monetizing Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the internet and used for advertising, analytics, and marketing optimization.

198.    Interception occurred whenever Plaintiff interacted with the Website, including when he navigated webpages, used search or location features, viewed menu items, initiated an order, or otherwise communicated information to the Website through his browser.

199.    At all relevant times, the Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

200.    Plaintiff was never asked to consent to the interception, recording, disclosure, or use of his electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiff affirmatively declined non-essential tracking through Defendant's Cookie Preferences Interface.

201.    The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

202.    As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c.    reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Common Law Fraud, Deceit, and/or Misrepresentation
### (On behalf of Plaintiff and All Class Members)

203.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

204.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

205.    Defendant made affirmative representations to users through its cookie banner, Cookie Preferences Interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

206.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and analytics cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

207.    Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

208.    These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit user data to third parties.

209.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

210.    Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit

websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

211.    Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

212.    Plaintiff and Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

213.    Plaintiff's reliance was reasonable because Defendant presented the cookie banner and Cookie Preferences Interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

214.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

215.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

216.    Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and All Class Members)

217.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

218.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

219.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

220.    Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent is unjust.

221.    Plaintiff and Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES,
### N.Y. GEN. BUS. LAW § 349
### (On behalf of Plaintiff and the Class)

222.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

223.    N.Y. Gen. Bus. ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."

224.    Defendant conducts consumer-oriented business and trade from its headquarters in Brooklyn, New York, including the operation of its website, in its advertising and sale of goods throughout the country, as required by GBL § 349.

225.    Defendant violated GBL § 349 by deceptively representing, through its cookie banner and Cookie Preferences Interface, that users could control the collection, sale, or sharing of their Sensitive Information, while continuing to permit Tracking Entities to collect and disclose users' data regardless of users' cookie choices.

226.    Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, falsely represented that users were provided a particular level of privacy protection and control over their Sensitive Information, when in fact Defendant continued to collect, disclose, and transmit users' Sensitive Information to Tracking Entities through the Tracking Tools regardless of users' cookie selections.

227.    Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, were directed at consumers, including Plaintiff, visiting Defendant's Website, occurred repeatedly in the course of Defendant's online business practices, and were capable of deceiving a substantial portion of the consuming public with respect to the collection and disclosure of their Sensitive Information.

228.    The facts misrepresented, concealed, or not disclosed by Defendant were material in that Plaintiff and the Class, and other reasonable consumers, would have considered them in deciding whether and how to interact with Defendant's Website. Had Plaintiff and members of the Class known that Defendant continued to collect and disclose their Sensitive Information through

tracking technologies regardless of users' cookie preferences, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid or block such data collection.

229.    Defendant alone possessed the information that was material to the Plaintiff and Class and failed to disclose such material information to consumers.

230.    Defendant has engaged and continues to engage in deceptive conduct in violation of GBL section 349.

231.    The misrepresentations and partial misrepresentations, including the Misrepresentations, Omissions, active concealment, and other deceptive conduct described herein, caused Plaintiff and the Class to suffer injury in the form of actual damages, including the loss of control and value of their Sensitive Information and the unauthorized disclosure of Sensitive Information to Tracking Entities, which they would have avoided had Defendant accurately disclosed its data-collection and tracking practices.

232.    Defendant intended for Plaintiff and the Class to rely on its misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the nature and extent of its data-collection and tracking practices when deciding whether and how to interact with Defendant's Website, while unaware of the undisclosed material facts.

233.    GBL § 349 applies to the Plaintiff and Class because the State of New York has an interest in regulating business conduct in the region. Defendant's U.S.-based operations emanate from its Brooklyn office, which is listed as a contact point for various consumer-facing programs.

234.    Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Class. Defendant's conduct will continue to damage both the Plaintiff and Class Members and deceive the public unless enjoined by this Court.

235.    As a direct and proximate result of Defendant's violations, Plaintiff, the Class, and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and information-sharing practices.

## SIXTH CAUSE OF ACTION
## VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
## N.Y. GEN. BUS. LAW § 350
**(On behalf of Plaintiff and the Class)**

236.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

237.    N.Y. Gen. Bus. ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

238.    Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect . . . [where "misleading" refers to] representations made by statement, word, design, . . . or any combination thereof, but also to the extent to which to which the advertising fails to reveal facts material in the light of such representations . . . ."

239.    Defendant knew or should have known that its representations regarding users' ability to control the collection, sale, or sharing of their Sensitive Information were false or misleading because the Tracking Tools continued to collect and disclose users' data through the Website regardless of users' cookie preferences.

240.    Defendant purposely misrepresented, actively concealed, and failed to disclose material facts regarding its data-collection, tracking, and information-sharing practices to consumers, including Plaintiff and the Class.

241.    The facts misrepresented, concealed, or otherwise undisclosed by Defendant were material in that Plaintiff, the Class, and other reasonable consumers would have considered them when deciding whether and how to interact with Defendant's Website. Had Plaintiff and the Class known that Defendant continued to collect and disclose their Sensitive Information through Tracking Tools regardless of users' cookie preferences, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid such data collection.

242.    Defendant obtained a benefit from Plaintiff and the Class by collecting, using, and disclosing their Sensitive Information through Tracking Entities, while depriving them of the ability to control the use and sharing of that Sensitive Information, despite the availability of reasonable alternatives that do not engage in the same deceptive data-collection practices.

243.    Defendant's conduct caused Plaintiff and the Class to suffer actual damages by depriving them of the ability to make informed choices about the collection and disclosure of their personal information and by subjecting them to unauthorized tracking and data sharing, which they would have avoided had Defendant accurately disclosed its data-collection practices.

244.    As a direct and proximate result of Defendant's violation of New York General Business Law § 350, Plaintiff and the Class have been injured, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and Sensitive Information-sharing practices on the Website.

245.    Defendant's conduct has also substantially injured the public, as consumers across the country were exposed to and relied upon Defendant's representations regarding its data-privacy practices while unaware of material omissions—specifically, the failure to disclose that users' personal information was collected, shared, and disclosed to third parties through tracking technologies regardless of users' cookie preferences. Defendant's omissions deprived consumers of the ability to make informed decisions about their online privacy and created a false impression that users' choices meaningfully controlled data collection and sharing, thereby undermining public trust in websites that purport to offer transparency.

246.    Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

247.    Pursuant to GBL section 350-e, the Plaintiff and the Class seek injunctive relief, declaratory relief, actual and punitive damages or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

### SEVENTH CAUSE OF ACTION
### Invasion of Privacy
### Violations of N.Y. Civ. Rights Laws §§ 50, 51
### (On behalf of Plaintiff)

248.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above in paragraphs 1 through 7 and paragraphs 13 through 166 as though fully set forth herein.

249.    Plaintiff brings this cause of action on behalf of himself and all Class Members.

250.    Plaintiff and Class Members have a statutory privacy interest in their names, portraits, pictures, and voices under New York law.

251.    Defendant knowingly used Plaintiff's and Class Members' names and other Sensitive Information in the State of New York for advertising and trade purposes without first obtaining their written consent. Specifically, Defendant transmitted Plaintiff's and Class

Members' Sensitive information and identities, such as the FID, to Tracking Entities like Facebook for targeted online advertising and other commercial purposes, as described herein. Defendant's use of Plaintiff's and Class Members' names and Private Information did not serve any public interest.

252.    The unlawful tracking of Plaintiff and Class Members and the disclosure of their names caused damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff and Class Members have also suffered nominal damages.

253.    Defendant failed to protect Plaintiff's and Class Members' Sensitive Information and acted knowingly when it installed the Tracking Tools onto the Website because the purpose of the Tracking Tools is to track and disseminate visitors' communications with the Website for the purpose of marketing and advertising.

254.    Because Defendant intentionally and willfully incorporated the Tracking Entities into its Website and fraudulently told visitors that they could disable the Tracking Tools, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

255.    Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff and Class Members are entitled to nominal damages.

256.    Plaintiff and Class Members are entitled to exemplary and/or punitive damages as a result of Defendant's knowing violations of their statutory rights to privacy.

257.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Sensitive Information is still in the possession of Defendant and the Tracking Entities, and the wrongful disclosure of the information cannot be undone.

258.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's and the Tracking Entities' continued possession of their Sensitive Information.

259.    A judgment for monetary damages will not undo Defendant's disclosure of the information to the Tracking Entities, who, on information and belief, continue to possess and utilize that information.

260.    Plaintiff, on behalf of himself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into Plaintiff's and Class Members' statutory privacy interests.

## **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

a.    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

b.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e.    An award of statutory damages or penalties to the extent available;

f.    For damages in amounts to be determined by the Court and/or jury;

g.    For pre-judgment interest on all amounts awarded;

h.     For an order of restitution and all other forms of monetary relief;

i.     Reasonable attorneys' fees and costs; and

j.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: January 19, 2026           **LEVI & KORSINSKY, LLP**

By: */s/ Mark S. Reich*
Mark S. Reich (MR-4166)
Gary Ishimoto*
Mark Jensen*
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email:mjensen@zlk.com

*Counsel for Plaintiff*

*pro hac vice* forthcoming